UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: VOLKSWAGEN "CLEAN DIESEL"
MARKETING, SALES PRACTICES, AND
PRODUCTS LIABILITY LITIGATION

_____/

This Order Relates To:
Dkt. Nos. 6330, 6332, 6333, 6334

_____/

MDL No. 2672 CRB  (JSC)

**ORDER GRANTING MOTIONS TO
DISMISS**

 

Volkswagen salespersons, in a proposed class action, contend that they were harmed by the company's diesel scandal.  Volkswagen and other defendants (who are alleged to have conspired with the company) have moved to dismiss the complaint.  Because each claim in the complaint contains one or more pleading deficiencies, the Court GRANTS the motions.

## I.  BACKGROUND[1]

Plaintiffs are three car salespersons who, at various times from 2010 to the present, have worked at Volkswagen dealerships in California.  Their pay is almost entirely commission based: when they sell a car, they get a percentage of the dealer's profits on the sale.  An additional commission on each sale comes directly from Volkswagen.  The remainder of their pay is bonus based.  If they sell a target number of cars in a given month, for example, the dealer pays them a bonus.  If their customer service ratings meet a certain threshold, Volkswagen will award them a separate bonus.

After the public learned in 2015 that Volkswagen, for the better half of a decade, had installed defeat devices in its "clean diesel" line of cars to mask unlawfully high emissions, there

---

[1] The following allegations appear in the complaint.  (*See* Dkt. No. 5053.)

United States District Court
Northern District of California

was a measurable drop in the sale of new Volkswagen cars.  Consumers were shocked by the blatancy and scale of the fraud and became less interested in the brand.  The decline in demand for Volkswagen cars in turn meant that Plaintiffs made less money.

Seeking to recover that lost income, Plaintiffs filed this action.  Styled as a proposed class action, they seek to represent Volkswagen salespersons nationwide.  They have named as defendants Volkswagen AG (VWAG), Volkswagen Group of America, Inc. (VWGoA), Audi AG, Martin Winterkorn and Matthias Müller (former CEOs of VWAG), Rupert Stadler (former CEO of Audi AG), Bosch GmbH and Bosch LLC (electronics companies that partnered with Volkswagen), and Volkmar Denner (Bosch GmbH's CEO).  They also named Porsche AG as a defendant but later agreed to dismiss all claims against Porsche AG.  (*See* Dkt. No. 6549.)

The causes of action are for breach of contract, negligent interference with prospective economic advantage, fraud, and violation of RICO.  Four motions to dismiss have been filed: one by VWAG, VWGoA and Audi AG (together "VW"), one by Bosch GmbH and Bosch LLC (together "Bosch"), one by Martin Winterkorn, and one by Rupert Stadler.  (Defendants Müller and Denner have not appeared in the case.)  The arguments raised in the motions are considered below.

## II.  DEALER CLASS SETTLEMENT RELEASE

VW first argues that the claims against it should be dismissed because those claims were released as part of the class settlement that the company reached with its authorized franchise dealers.  (*See* Dkt. No. 2807 (settlement approval order).)  VW contends that under the plain terms of that agreement, Plaintiffs are among the "Releasing Parties" and their claims fall within the scope of the "Released Claims."

The settlement defined the Releasing Parties as "Dealer Settlement Class Members, for and on behalf of themselves and their agents, heirs, executors, and administrators, successors, assigns, insurers, attorneys, representatives, shareholders, owners, owner associations, and any other legal or natural persons who may claim by, through or under them . . . ."  (Dkt. No. 2802 ¶ 9.3.)  The Releasing Parties agreed in the settlement to release VWAG, VWGoA, and other "Released Parties" from all "Released Claims."  (*Id.*; Dkt. No. 1970 ¶ 9.2.)  "Released Claims" included "all

claims related in any way to the TDI Matter," i.e., to the diesel scandal. (Dkt. No. 2802 ¶ 9.3; Dkt. No. 1970 ¶ 2.27.)

VW maintains that Plaintiffs were among the "Releasing Parties" because they were "agents" and "representatives" of Dealer Settlement Class Members. Plaintiffs object, arguing that as rank-and-file salespersons, they lacked the level of authority that would have given rise to an agency relationship with the dealerships at which they worked.

Putting aside the question of whether Plaintiffs were the dealers' agents or representatives, the Court concludes that Plaintiffs are not Releasing Parties because they are not pursing claims "by, through or under" Dealer Settlement Class Members. As the Court previously explained in resolving a motion to enforce the settlement, the "by, through, or under" phrase modifies not just the catch-all phrase that precedes it ("any other legal or natural persons who may claim by, through or under" Dealer Settlement Class Members), but also each category of persons listed in the release (e.g., the dealers' agents, heirs, representatives, owners, and shareholders). *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.* (*VW Altomare*), No. MDL 2672 CRB, 2018 WL 1588012, at *6 (N.D. Cal. Mar. 30, 2018). Given this prior interpretation, the release only applies to the claims of a VW franchise dealer's agents and representatives if those claims are made "by, through or under" a Dealer Settlement Class Member. Plaintiffs' claims are not of this kind.

Plaintiffs are not attempting to step into the shoes of franchise dealers and assert claims on their behalf. Instead they are alleging (i) that VW breached contracts that it had with its salespersons, (ii) that VW negligently interfered with its salespersons' business relations, (iii) that VW committed fraud by making misrepresentations to (and concealing material facts from) its salespersons, and (iv) that VW committed wire fraud (and violated RICO) by participating in an enterprise whose purpose was to deceive regulators, VW salespersons, and the public. (*See* Compl. ¶¶ 80, 87, 99–100, 103–04, 118.) These claims are not based on VW's dealings with its franchise dealers; they are based on VW's dealings with its salespersons, regulators, and consumers. The claims, then, are not brought "by, through or under" Dealer Settlement Class Members.

This conclusion is consistent with *VW Altomare*, where the Court held that the fraud claims of the sole owner of a VW dealership *were* brought "by, through, or under" a Dealer Settlement Class Member and were thus released. *See* 2018 WL 1588012, at *6–7. In *VW Altomare*, there was no real distinction between the claims of the dealership and the claims of the dealer's owner, the latter of which were asserted in a separate, post-settlement complaint. The claims were all based on a single person's interactions with VW, and that person received compensation in the dealer class settlement. Here, there is a distinction between Plaintiffs and the dealerships at which they worked. Plaintiffs' claims are based in part on the relationships that they had with VW as VW salespersons. Those relationships are separate and apart from the relationships that VW had with its franchise dealers. Unlike the claims in *VW Altomare*, then, Plaintiffs are not bringing their claims "by, through, or under" Dealer Settlement Class Members. This means Plaintiffs are not Releasing Parties and that the settlement does not foreclose their claims.

### III. BREACH OF CONTRACT

Turning to the claims themselves, the first cause of action is for breach of contract and is against VWAG and VWGoA. A breach of contract claim has four elements: (1) the existence of a contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach. *See CDF Firefighters v. Maldonado*, 158 Cal. App. 4th 1226, 1239 (2008). The contract claim against VWAG does not satisfy the first of these elements, and the contract claim against VWGoA does not satisfy the third of these elements.

With respect to VWAG, the complaint makes no mention of any agreements between Plaintiffs and VWAG. With no allegations supporting the existence of a contract, a necessary element of the claim is missing. Plaintiffs have thus failed to state a breach of contract claim against VWAG.

As for the contract claim against VWGoA, Plaintiffs have identified agreements that they entered into with VWGoA, but they have not adequately alleged that VWGoA breached those agreements. As alleged, VWGoA agreed to do two things: (i) to pay Plaintiffs a commission for each Volkswagen car that they sold, and (ii) to compensate Plaintiffs based on their customer service scores. (*See* Compl. ¶¶ 80–82.) At no point in the complaint is there a suggestion that

1   VWGoA did not honor these obligations.  Plaintiffs do argue that VWGoA's diesel scandal

2   interfered with their ability to sell *more* VW cars and to obtain more compensation from VWGoA;

3   but there is no contention that VWGoA promised Plaintiffs that they would sell a specific number

4   of cars.  Even if the diesel scandal caused Plaintiffs to sell fewer cars, that result did not breach the

5   express terms of the agreements that are identified.

6        In their opposition brief, Plaintiffs cite to six paragraphs from their complaint which they

7   maintain include allegations that VWGoA also agreed to provide them with "marketable, legally-

8   compliant vehicles," which they assert VWGoA did not do.  (Opp'n to VW, Dkt. No. 6441 at 31.)

9   The cited paragraphs do not include any allegations supporting that VWGoA made such a promise

10  to Plaintiffs, and Plaintiffs cannot use their opposition brief to amend their complaint.  *See Broam*

11  *v. Bogan*, 320 F.3d 1023, 1026 n.2 (9th Cir. 2003) (district court cannot consider facts in

12  opposition brief in considering Rule 12(b)(6) motion to dismiss).

13       Even if VWGoA did not breach an express contractual term, Plaintiffs alternatively assert

14  that VWGoA, through its diesel scandal, breached the covenant of good faith and fair dealing.

15  (*See* Compl. ¶¶ 88–92.)  Under California law, a covenant of good faith and fair dealing is an

16  "implied term in every contract."  *Chodos v. W. Publ'g Co.*, 292 F.3d 992, 996 (9th Cir. 2002).  In

17  general, the covenant "imposes upon each contracting party the duty to refrain from doing

18  anything which would render performance of the contract impossible by any act of his own, [and]

19  also the duty to do everything that the contract presupposes that he will do to accomplish its

20  propose."  *Pasadena Live v. City of Pasadena*, 114 Cal. App. 4th 1089, 1093 (2004) (citation

21  omitted).

22       As an example of its application, in construction contracts the covenant of good faith and

23  fair dealing obligates the property owner to "furnish the selected site of operations to the

24  contractor in order to enable him to adequately carry on the construction and complete the work

25  agreed upon."  *Hensler v. City of L.A.*, 124 Cal. App. 2d 71, 82–83 (1954) (internal quotation

26  marks omitted).  If the property owner does not make the property available, performance of the

27  contract would be impossible.  As another example, when benefits are due under an insurance

28  policy, "delayed payment based on inadequate or tardy investigations . . . may breach the implied

5

covenant [by] . . . frustrat[ing] the insured's right to receive the benefits of the contract in 'prompt compensation for losses.'" *Waller v. Truck Ins. Exchange, Inc.*, 900 P.2d 619, 639 (Cal. 1995) (citation omitted).

While the covenant will "prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefit of the agreement," *id.*, it "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement," *Agosta v. Astor*, 120 Cal. App. 4th 596, 607 (2004) (citation omitted). So, for example, if an individual and a company enter into an at-will employment agreement, the covenant cannot be used by the individual to impose a requirement that termination only be for good cause. *See Foley v. Interactive Data Corp.*, 765 P.2d 373, 400 n.39 (Cal. 1988).

Plaintiffs' implied covenant claim falls into this latter category, as one that attempts to impose substantive duties beyond those incorporated in the specific terms of the agreement. The injury asserted by Plaintiffs is that they were not able to sell more cars (and earn more commissions) because of VWGoA's diesel scandal. But as noted above, there is no suggestion that the agreements in question contained sales volume terms (e.g., that Plaintiffs could expect to sell 100 cars per year). VWGoA did what the agreements presupposed it would do to accomplish their purpose: it provided Plaintiffs with cars to sell and compensated Plaintiffs when they sold those cars. VWGoA did not "render performance of the contract impossible" or fail to take steps "to accomplish [the agreements'] purpose." *Pasadena Live*, 114 Cal. App. 4th at 1093.

It was in VWGoA's best interests that Plaintiffs would sell more Volkswagen cars; and from the allegations there is no reason to believe that VWGoA sought to (or did) interfere with Plaintiffs ability to sell those cars. That consumer demand for Volkswagen cars dropped after the diesel scandal does not mean that VWGoA breached the implied covenant of good faith and fair dealing in the commission agreements that it had with Plaintiffs.

The allegations do not support Plaintiffs' breach of contract claims against VWAG and VWGoA. VW's motion to dismiss these claims is GRANTED and the claims are dismissed with leave to amend.

United States District Court
Northern District of California

## IV.    NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

Plaintiffs' second cause of action, which they bring against all Defendants, is for negligent interference with prospective economic advantage.  To support this claim, Plaintiffs must allege that Defendants interfered with one or more existing relationships that Plaintiffs stood to benefit from.  *See Venhaus v. Shultz*, 155 Cal. App. 4th 1072, 1077–78 (2007).  They must also identify those relationships with particularity.  *See UMG Recordings, Inc. v. Glob. Eagle Entm't, Inc.*, 117 F. Supp. 3d 1092, 1118 (C.D. Cal. 2015).

Defendants argue that Plaintiffs have not satisfied the particularity requirement, and the Court agrees.  Plaintiffs allege that Defendants, through the diesel scandal, interfered with economic relationships that Plaintiffs had "with third parties." (Compl. ¶ 94.)  Not until their opposition brief do Plaintiffs identify who those third parties were: (i) repeat Volkswagen customers, and (ii) the franchise dealers that employed Plaintiffs.  (*See* Opp'n to VW, Dkt. No. 6441 at 22–23.)  For their negligent interference claim against Bosch, Plaintiffs add a third relationship: stating in their opposition brief that Bosch also interfered with Plaintiffs' relationships with Volkswagen.  (*See* Opp'n to Bosch, Dkt. No. 6451 at 15–16.)  These three relationships are not readily apparent from the general allegation that Defendants interfered with economic relationships that Plaintiffs had with third parties.

Citing to the factual background section of their complaint, Plaintiffs argue that, in fact, they have identified these relationships with the necessary particularity.  (*See* Opp'n to VW, Dkt. No. 6441 at 23 (citing Compl. ¶¶ 46–49, 60–62).)  The Court disagrees, because as currently structured the complaint leaves significant guesswork for Defendants and the Court.  At no point in the complaint do Plaintiffs explicitly identify the relationships on which their negligent interference claim is predicated.  The result is that Defendants, in their motions to dismiss, were forced to guess about the relevant relationships; and only after Plaintiffs filed their opposition were Defendants, in reply, able to fully address the claim.

Because the complaint does not identify with particularity the relationships that Defendants interfered with, Plaintiffs' negligent interference claim is inadequately pled.  Defendants' motions

to dismiss the claim are GRANTED and the claim is dismissed with leave to amend.[2]

## V. FRAUD

Plaintiffs' third cause of action, which is brought against all Defendants, is for common law fraud. As alleged "Volkswagen," a term Plaintiffs use to refer to all Defendants, "affirmatively misrepresented to Plaintiffs . . . in advertising and other forms of communication . . . that [its diesel cars] had no significant defects, complied with EPA regulations and would perform and operate properly when driven in normal usage." (Compl. ¶ 104.) Plaintiffs maintain that these representations were false, and that Defendants knew so, because they had installed illegal defeat devices in the cars, and they knew that the cars were "defective, non-EPA compliant, unsafe, and unreliable because [they] contained faulty and defective Clean Diesel engine systems." (*Id.* ¶¶ 105-06.)

Plaintiffs also allege that "Volkswagen intentionally concealed that the Clean Diesel engine systems [in its diesel cars] were not EPA-compliant and used a 'defeat device.'" (*Id.* ¶ 103.) They assert that this concealed information was "highly relevant to their business decisions to sell VW vehicles" and that Defendants had a duty to disclose this information because Plaintiffs "relied on Volkswagen's material representations that the Defective Vehicles they were selling for commission were environmentally clean, efficient and free from defects." (*Id.* ¶¶ 103, 107.)

Defendants argue that Plaintiffs' fraud allegations do not satisfy Rule 9(b). The Court agrees. Two Rule 9(b) requirements are relevant. First, the rule requires the pleader of fraud to "state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) (en banc) (citation omitted). For example, if a plaintiff alleges that false or misleading advertisements were directed at him, he must specify "what the . . . advertisements . . . specifically stated, . . . when he was exposed to them[,] [and] which ones he found material." *Kearns v. Ford*

---

[2] The Court will not consider Defendants' other arguments for dismissal of the negligent interference claim unless Plaintiffs amend their complaint and identify with particularity the relevant economic relationships on which their claim is based.

8

*Motor Company*, 567 F.3d 1120, 1126 (9th Cir. 2009). Second, under Rule 9(b), a complaint cannot "merely lump multiple defendants together," but must instead "identify the role of each defendant in the alleged fraudulent scheme." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citation omitted).

The allegations fall short of Rule 9(b) in several ways. First, Plaintiffs have not identified the time and place of Volkswagen's representations to them. In arguing to the contrary—as to time—Plaintiffs point to allegations that the fraud began "in at least 2009" and ended when Volkswagen publicly admitted to the fraud in September 2015. (*See* Opp'n to VW, Dkt. No. 6441 at 26 (citing Compl. ¶¶ 28, 40).) That representations were made at some point during a seven year window is not specific enough to put Defendants on notice of the representations on which Plaintiffs intend to rely.

As to the "place" where the representations were made, Plaintiffs point to allegations that representations were made "in the various media through which Volkswagen disseminated its advertising materials and sold its vehicles." (*Id.* (citing Compl. ¶¶ 32-39).) From context it appears that the referenced advertisements were directed at consumers, not VW salespersons. (*See, e.g.*, Compl. ¶ 35 (discussing Volkswagen television advertisements).) In any event, Plaintiffs have not identified which of the advertisements they were exposed to and found material. *See Kearns*, 567 F.3d at 1126. General allegations about Volkswagen's media campaign are not sufficient to support Plaintiffs' misrepresentation claims. *See, e.g.*, *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 987 (N.D. Cal. 2018) ("While the [complaint] does refer to [Fiat's] website and some blogs operated by a [Fiat] entity, there is no allegation that any named plaintiff actually saw the website or blogs, or any promises contained therein, regarding fuel economy and performance.") (citations omitted).

Second, Plaintiffs have not adequately identified the parties to the representations. *See Odom*, 486 F.3d at 553. Alleging, as they do, that the representations were made by "Volkswagen" is insufficient under the circumstances. Without more detailed allegations, it is simply implausible that every defendant made every misrepresentation at issue. (Why, for

example, would Bosch GmbH's CEO, Volkmar Denner, have made representations about Volkswagen's diesel cars in Volkswagen television advertisements?)

Third, Plaintiffs have not sufficiently alleged that the individual defendants knew that Volkswagen's diesel cars were "defective, non-EPA-compliant, unsafe, and unreliable." (Compl. ¶¶ 105-06.) Although Rule 9(b) permits knowledge to be alleged generally, allegations of knowledge must still be factual, not conclusory. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678, 680–81 (2009). The allegations of knowledge here fall into this latter category. Without any supporting facts, Plaintiffs simply allege that Winterkorn, Stadler, Müller, and Denner "approved, authorized, directed, ratified, and/or participated in the acts complained of herein." (Compl. ¶¶ 16-18, 21.)

Plaintiffs respond by noting that they used the umbrella term "Volkswagen" to refer to all Defendants. They argue that when considering the allegations against the individual defendants, the Court should thus look not only to the paragraphs where they are named, but also to any paragraph that makes reference to "Volkswagen's" conduct. This form of group pleading is not permitted by Rule 9(b), which "does not allow a complaint to merely lump multiple defendants together." *Swartz*, 476 F.3d at 764. The group pleading is particularly inapt as to Stadler, who notes in his motion to dismiss that it cannot possibly be true that all references to "Volkswagen" are to him. The "Volkswagen" misconduct began "in at least 2009, if not sooner," which is one year before Stadler became CEO of Audi AG. (*See* Compl. ¶¶ 18, 28.) Even if Stadler worked at Audi AG prior to 2010, an allegation that is not explicitly made, there is no reason to believe that prior to 2010 he was in a position to "authorize[] . . . the acts complained of" in the complaint. (*Id.* ¶ 18.) Plaintiffs' group pleading does not satisfy Rule 9(b).

Finally, Plaintiffs' fraud-by-omission theory also falls short of the Rule 9(b) standard. For fraud by omission, Plaintiffs must establish that Defendants had a duty to disclose the information that was omitted. *See LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997). In their complaint, the only duty that Plaintiffs identify is the duty to disclose information that is necessary to avoid making partial representations misleading. (*See* Compl. ¶ 107 ("Volkswagen had a duty to be truthful and to disclose that these Defective Vehicles were defective, non-EPA compliant and unreliable . . . , because Plaintiffs . . . relied on Volkswagen's material representations that the

Defective Vehicles they were selling for commission were environmentally clean, efficient and free from defects.").) Plaintiffs have not identified "the who, what, when, where, and how" of these partial representations. *Kearns*, 567 F.3d at 1126. As a result, the partial representations do not give rise to a duty to disclose. *See Espineli v. Toyota Motor Sales, U.S.A., Inc.*, No. 2:17-CV-0698-KJM-CKD, 2019 WL 2249605, at *4–5 (E.D. Cal. May 24, 2019) (explaining that allegations of partial representations by the defendant must satisfy Rule 9(b) if they are to support that the defendant had a duty to disclose additional facts).[3]

Plaintiffs' fraud cause of action is not adequately pled. Defendants' motions to dismiss the fraud claim are GRANTED and the claim is dismissed with leave to amend.

## VI. RICO

Plaintiffs' final cause of action is for violation of RICO, 18 U.S.C. § 1962(c), (d). They bring this claim against each defendant except VWGoA, referring to Defendants minus VWGoA as the "RICO Defendants." (*See* Compl. ¶ 114.) In moving to dismiss the RICO claim, Defendants argue that the allegations fail to satisfy Rule 9(b), do not meet RICO's proximate cause standard, and do not support an injury to "business or property," as needed for RICO standing.

### A. The RICO Allegations and Rule 9(b)

Rule 9(b) applies to the RICO claim because it is predicated on allegations of wire fraud. *See Odom*, 486 F.3d at 553–54. In some respects the wire fraud allegations are more detailed than the allegations supporting the common law fraud count. The theory of fraud is also somewhat different. While Plaintiffs' common law fraud claim is based on the theory that Defendants directly deceived VW salespersons, their wire fraud claim is based on a broader fraudulent scheme: that the RICO Defendants committed wire fraud by making material misrepresentations (and by failing to disclose material facts) to "government regulators, consumers, and Plaintiffs[.]" (Compl. ¶ 149.)

---

[3] Plaintiffs have used their opposition brief to argue that a duty to disclose is supported on other grounds. (*See* Opp'n to VW, Dkt. No. 6441 at 28.) The Court will not consider those grounds unless they are included in an amended complaint.

United States District Court
Northern District of California

While not overlapping entirely with the common law fraud claim, the wire fraud claim also does not satisfy Rule 9(b).  To the extent that Plaintiffs seek to base the claim on representations that were made to them, those representations are not described with any specificity.  At no point in the complaint do Plaintiffs identify any particular representations that the RICO Defendants made to them or to other VW salespersons.  The pleading of this theory falls far short Rule 9(b), which requires Plaintiffs to identify "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation."  *Odom*, 486 F.3d at 553 (citation omitted).

To the extent that Plaintiffs seek to base their wire fraud claim on representations that were made to regulators, the allegations are more precise but are still lacking required detail.  Plaintiffs allege that the RICO Defendants used the wires to send fraudulent applications for certificates of conformity to the EPA.  (*See* Compl. ¶ 141.)  Elsewhere, they allege that the RICO Defendants used VWGoA and Porsche Cars North America to make these submissions to the EPA.  (*See id.* ¶ 122.)  These allegations identify the "who," "where," and "how" of the representations, but they do not cover "when" the representations were made, or "what" the submissions stated that was false or misleading.  *See Kearns*, 567 F.3d at 1124.  Other complaints in this MDL have answered those questions, but the same level of detail is missing here.

To the extent that Plaintiffs seek to base their wire fraud claim on representations to consumers, the allegations come the closest to satisfying Rule 9(b), but are still lacking.  Plaintiffs generally allege that "Volkswagen made misrepresentations about the Defective Vehicles on their websites, YouTube, and through advertisements made on various platforms, including on the internet and on television, all of which were intended to mislead regulators[4] and the public about the [vehicles'] fuel efficiency, emissions standards, and other performance metrics."  (Compl. ¶ 142.)  Plaintiffs then offer specific examples of these misrepresentations:

> For example: (1) Volkswagen caused a commercial to be aired during the Super Bowl, and thereafter over the internet, on February 7, 2010

---

[4] Plaintiffs do not explain why regulators would have been relying on website and YouTube advertisements, so the Court construes these allegations as focused on the consumer-based fraud.

12

United States District Court
Northern District of California

> touting the "Audi A3 TDI clean diesel" as the "Green Car of the Year"; and (2) Volkswagen caused a commercial to be aired via television and/or the internet in or around early 2015 advertising the Volkswagen Golf TDI clean diesel to disprove the "old wives tale" that "diesel is dirty" by holding a white scarf to the exhaust pipe.

(*Id.*)

These allegations include the "time, place, and specific content of the false representations," as required by Rule 9(b). *See Odom*, 486 F.3d at 553. But the allegations still fall short because they do not identify "the parties to the misrepresentation." *Id.* Plaintiffs allege that "Volkswagen" made these representations, which is the umbrella term used to refer to all Defendants. As noted above, this type of group pleading is not permitted; especially here when there is no reason to believe that certain defendants (e.g., Bosch and Volkmar Denner) were responsible for a Super Bowl advertisement about the Audi A3. For fraud-based claims, "there is no absolute requirement that . . . the complaint must identify false statements made by each and every defendant." *Swartz*, 476 F.3d at 764 (emphasis omitted). But if Plaintiffs are going to claim—as they currently do—that *all* Defendants made these statements, more specifics are needed.

The above discussion focuses on the misrepresentations that are alleged. Plaintiffs also seek to base their wire fraud claim on allegations that Defendants failed to disclose material facts to regulators, consumers, and VW salespersons. (*See* Compl. ¶ 139.) To prevail on this theory, Plaintiffs need to identify a duty to disclose. They have not done so. No duty to disclose is identified under their RICO count.

The RICO cause of action does not satisfy Rule 9(b).

**B.    RICO Proximate Cause**

Defendants argue that Plaintiffs' RICO claim also falls short on proximate cause grounds. Below, the Court reviews the relevant proximate cause standard and then considers whether the allegations satisfy that standard.

**1.    Legal Standard**

The requirement of proximate cause has taken "many shapes" at common law—e.g., foreseeability, directness, certainty of damages. *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258,

268 (1992) (citing *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 532–33 (1983)). For civil RICO claims, directness is the most important of these: "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006); *see also Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 12 (2010) (plurality) ("The concepts of direct relationship and foreseeability are of course two of the many shapes proximate cause took at common law. Our precedents make clear that in the RICO context, the focus is on the directness of the relationship between the conduct and the harm.").

The directness requirement reflects that while unlawful conduct may cause "ripples of harm," the remediation of more distant ripples often poses administrative problems that can be avoided in suits by the directly injured. *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1306 (2017) (citation omitted). For example, "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." *Holmes*, 503 U.S. at 269. Also, if the claims of the indirectly injured are recognized, courts may be forced "to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries." *Id.* As *Holmes* explained: "The need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Id.* at 269-70; *see also id.* at 271 (noting that the "general tendency of the law, in regard to damages at least, is not to go beyond the first step" (quoting *Associated General*, 459 U.S. at 534)).

### 2. Application

Defendants' conduct was several steps removed from Plaintiffs' lost income. As alleged, Defendants initially duped regulators into certifying—and consumers into buying—Volkswagen's diesel cars (step one). When the veil was lifted on Volkswagen's defeat device scheme, consumers who had bought the cars—and the public at large—became less inclined to buy other Volkswagen cars that were still available for sale (step two). This meant that VW dealers'

14

revenues and profits declined as they sold fewer cars (step three).  In turn, VW salespersons made less money because their income was commission based and thus tied to the number of cars that they sold (step four).

The just laid out effects of Volkswagen's diesel scandal are illustrative of the ripples of harm that fraudulent conduct may cause.  But as noted above, the "general tendency" of the law with respect to damages under RICO is "not to go beyond the first step."  *Holmes*, 503 U.S. at 271; *see also Pillsbury, Madison & Sutro v. Lerner*, 31 F.3d 924, 929–31 (9th Cir. 1994) (holding that sublessee lacked RICO standing when the alleged injury was derivative of the master tenant's direct injury).

Moving several steps down the causal chain would cause the same problems here that *Holmes* identified.  First, it would be necessary to isolate the decline in Plaintiffs' commissions that was due to Defendants' conduct as opposed to other causes.  Plaintiffs' commissions could have dropped for a variety of reasons (e.g., economic downturn, dealership-specific changes, salesperson-specific personal circumstances) and only the decline due to the diesel scandal would potentially be recoverable.

Second, it would likely be necessary to apportion damages among VW dealers (who have already sued and settled with Volkswagen) and VW salespersons.  As alleged, the salespersons received a percentage of the dealers' profits on each car sale.  To the extent that VW dealers have already recovered their lost profits due to the diesel scandal, a recovery by VW salespersons could amount to a double recovery.

Third, as Bosch notes, if VW salespersons could recover for their injuries under these circumstances, it would be difficult to find a limiting principle.  Any third party who claimed that their income turned on the sale of cars at a VW dealership, "ranging from automobile workers to advertising employees to the food truck parked outside the dealership," could bring RICO claims for lost income, and those claims would be hard to distinguish from Plaintiffs'.  (Bosch Mot., Dkt. No. 6333 at 15.)

The doctrine of proximate cause is designed to avoid these types of cascading claims of injury.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014)

(explaining that proximate cause "reflects the reality that 'the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing'" (quoting *Associated General*, 459 U.S. at 536)).  And given that more direct victims of Volkswagen's conduct have already sued and recovered from the company, "[t]he need to grapple with the[] problems" generated by Plaintiffs' more remote RICO claim is "simply unjustified."  *Holmes*, 503 U.S. at 269.

Plaintiffs, in arguing that they have sufficiently alleged proximate cause, rely heavily on *Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005) (en banc).  The court held there that a man who claimed that he was falsely imprisoned had sufficiently alleged a RICO injury to "business or property" based on his assertion that the imprisonment caused him to lose employment and employment opportunities.  *See id.* at 898, 901.  Much of *Diaz* focused on what qualifies as an injury to "business or property" under RICO, but the court also touched on proximate cause.  In doing so the court rejected an argument that, because the lost wages were not the "direct target" of the false imprisonment, but were merely a "secondary effect," the plaintiff's loss of wages was not proximately caused by his false imprisonment.  *Id.* at 901.  The court explained that RICO does not impose a "direct target" limitation, and that proximate cause is "generous enough to include the unintended, though foreseeable, consequences of RICO predicate acts."  *Id.* (citing *Holmes*, 503 U.S. at 265–68; *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339 (1928)).

Plaintiffs argue that *Diaz* endorsed a foreseeability standard for RICO proximate cause.  And they contend that under that standard, their lost commissions are recoverable.  (*See* Opp'n to VW, Dkt. No. 6441 at 21 ("Volkswagen cannot seriously argue that a substantial impact on Plaintiffs' employment and economic opportunities, even if unintended, was [not] a foreseeable consequence of the RICO predicate acts.") (internal quotation marks omitted).)

As noted above, the Supreme Court has stated that the "central question" in analyzing proximate cause under RICO is not foreseeability, but whether the violation "led directly to the plaintiff's injuries."  *Anza*, 547 U.S. at 461; *see also Hemi*, 559 U.S. at 12.  *Diaz*, although focusing on foreseeability, did not hold otherwise.  *Diaz* rejected a "direct target" standard, but that is not the same as the directness standard that was endorsed in *Anza*.  "Direct target" suggests intentionality.  If the plaintiff in *Diaz* had needed to satisfy a "direct target" standard, he likely

would have needed to show that the police falsely arrested him with the intent that he would lose employment as a result. *Diaz* held that RICO did not impose such a requirement. Under *Anza*'s directness standard, in contrast, the same intentionality is not needed. *Anza* requires a showing that the violation "led directly to the plaintiff's injuries." 547 U.S. at 461. That standard was satisfied in *Diaz*: the plaintiff obviously could not pursue employment if he was in jail; his false imprisonment led directly to his loss of employment and employment opportunities. *See Diaz*, 420 F.3d at 900 ("[Plaintiff's] claimed financial loss? He could not fulfill his employment contract or pursue valuable employment opportunities because he was in jail.").

That proximate cause was found in *Diaz* also carriers little weight in analyzing proximate cause here. Unlike here, *Diaz* did not involve multiple ripples of injury from a RICO violation. A man asserted that he was falsely imprisoned by the defendants and that he lost employment as a result. The injury was direct and there were no intervening parties in the causal chain. The *Diaz* plaintiff's RICO claim, then, did not pose the kinds of difficulties that arise when the indirectly injured seek recovery.

Plaintiffs' alleged injuries from the diesel scandal are well beyond the first step in the causal chain. As a result, the Court concludes that proximate cause is lacking.

Having identified two reasons for dismissal of Plaintiffs' RICO claim, the Court declines to consider if there are any others. Defendants' motions to dismiss the RICO claim are GRANTED. Like the other claims in the complaint, the RICO claim is dismissed with leave to amend. To cure the identified deficiencies, Plaintiffs need to plead their RICO claim with more particularity and identify a more direct theory of causation.

## VII.    SERVICE OF PROCESS

Stadler has also moved to dismiss the claims against him under Rule 12(b)(5), based on insufficient service of process. There is no dispute that Plaintiffs did not serve Stadler with the operative, consolidated complaint. The Court therefore GRANTS Stadler's motion.

## VIII.    PERSONAL JURISDICTION

Stadler and Winterkorn have also moved to dismiss the claims against them under Rule 12(b)(2) for lack of personal jurisdiction. As explained above, the allegations are insufficient to

17

support any specific conduct by either of these individual defendants. As a result, it cannot be determined if either of them "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002). Specific personal jurisdiction is therefore lacking. Also, because Stadler and Winterkorn are German residents, and because Plaintiffs have not demonstrated that either of them have "continuous and systematic" contacts with the forum state (whether that be California or the United States), general personal jurisdiction also has not been established. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). As neither form of personal jurisdiction has been demonstrated, the Court GRANTS Stadler's and Winterkorn's Rule 12(b)(2) motions to dismiss for lack of personal jurisdiction.

Contemplating that the Court might grant the Rule 12(b)(2) motions, Plaintiffs have asked for leave to conduct jurisdictional discovery. Prior to discovery, other plaintiffs in this MDL have managed to provide more detail about Winterkorn's involvement in the diesel scandal. And indeed, on more than one occasion the Court has held that it has personal jurisdiction over Winterkorn. (*See* Dkt. No. 2636 at 33–40 (ADR securities action); Dkt. No. 3470 at 29–30 (bondholder's action).) Because other plaintiffs were able to establish personal jurisdiction over Winterkorn without jurisdictional discovery, Plaintiffs should be able to do so too.

As for Stadler, Plaintiffs' claims against him are based only on generalities. More is needed to support jurisdictional discovery. *See, e.g.*, *Miller v. Peter Thomas Roth, LLC*, No. C 19-0698 WHA, 2019 WL 1507767, at *5 (N.D. Cal. Apr. 5, 2019) (denying request for jurisdictional discovery because plaintiffs' "[c]onclusory allegations [were] unsupported and fail[ed] to make a *prima facie* showing that the exercise of jurisdiction [was] proper"); *Karabu Corp. v. Gitner*, 16 F. Supp. 2d 319, 325 (S.D.N.Y. 1998) (Sotomayor, J.) (explaining that "it would . . . raise grave due process concerns" if plaintiffs could sue corporate officers based only on their title and "subject [them] to depositions and discovery" without identifying a good faith basis for the claims against them).

Plaintiffs' request for jurisdictional discovery is DENIED.

# IX. CONCLUSION

Defendants' motions to dismiss the complaint are GRANTED. If Plaintiffs choose to amend their complaint, they must do so within 45 days of this Order.

**IT IS SO ORDERED.**

Dated: September 20, 2019

CHARLES R. BREYER
United States District Judge